IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERCIA ) | |
| ) | Case No. 1:18-mj-502 |
| v. ) | |
| ) | The Hon. Theresa C. Buchanan |
| KENDESIA MAY, ) | |
| a/k/a "Red," ) | |
| a/k/a "Reds," ) | |
| ) | |
| Defendant. ) | |

### AFFIDAVIT IN SUPPORT OF A
### CRIMINAL COMPLAINT AND ARREST WARRANT

I, Kendrah Peterson, being duly sworn, depose and state as follows:

## INTRODUCTION

1.  I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since 2006. I am currently assigned to Enforcement Group Forty-Four at the Washington Division Office, located in the District of Columbia.

2.  While with the DEA, I have participated in the investigation of narcotics traffickers and possessors. Many of these investigations led to the arrest and conviction of narcotics dealers and money launderers. In the course of conducting these investigations, I have used several different kinds of investigative techniques, including: interviewing informants and cooperating sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants, which have led to substantial seizures of narcotics,

firearms, contraband, and drug related assets; and, the analysis of financial documents and records.

3. This affidavit is being submitted in support of a criminal complaint charging KENDESIA MAY a/k/a "Red," a/k/a "Reds," ("MAY") with conspiracy to distribute 50 grams or more of methamphetamine (actual), a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

4. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

5. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

6. During the course of this investigation, investigators have used three cooperating sources (hereinafter, "CS-1", "CS-2" and "CS-3"). For purposes of this affidavit, all cooperating sources will be referred to in the masculine gender regardless of their true gender. The information provided by all of the cooperating sources has been corroborated by consensually monitored telephone calls, text messages, and other means. To my knowledge, none of the information provided by any cooperating sources has proved to be false, misleading, or inaccurate in any material respect.

7. CS-1 has cooperated with law enforcement since late 2017. CS-1 is an admitted drug user and had no prior criminal convictions. CS-1 is cooperating with law enforcement in

hopes of receiving credit for cooperation after he pleads guilty to a federal drug trafficking charge.

8. CS-2 has cooperated with law enforcement since 2018. CS-2 is an admitted drug user and has a prior conviction for drug possession. CS-2 is cooperating with law enforcement in hopes of receiving credit for cooperation for pending state drug trafficking charges.

9. CS-3 has cooperated with law enforcement since 2018. CS-3 is an admitted drug user and has prior convictions for: importation of a controlled substance, forgery of a financial instrument, false checks, possession of information for fraud, and possession of a controlled substance. CS-3 is cooperating with law enforcement in hopes of receiving credit for cooperation for pending state drug trafficking charges.

## PROBABLE CAUSE

A. <u>Background on Investigation</u>

10. In late 2017, cooperating sources informed law enforcement that MAY and an unindicted co-conspirator ("UCC-1") were involved in distributing large quantities of methamphetamine within the Eastern District of Virginia, and the surrounding metropolitan area. Law enforcement learned that MAY and UCC-1 coordinated Federal Express (FedEx) shipments of multiple pounds of methamphetamine from California to the Washington D.C. metropolitan area for further distribution. Law enforcement also learned that MAY was in direct contact with at least some of the conspiracy's methamphetamine customers and distributed methamphetamine in the Eastern District of Virginia, Washington D.C., and elsewhere.

B. <u>Historical Information provided by CS-1</u>

11. In March 2017, law enforcement encountered CS-1 during the controlled delivery of approximately 125 grams of methamphetamine to an address in Arlington, Virginia. CS-1 met with law enforcement and later agreed to plead guilty to federal drug trafficking charges in

3

the Eastern District of Virginia.

12. CS-1 met UCC-1 in approximately the summer of 2017 on, what he called, a "dating site," either "BBRT" or "Grindr". UCC-1 agreed to meet at CS-1's residence in Springfield, Virginia, located within the Eastern District of Virginia. During this meeting, UCC-1 possessed a quantity of suspected methamphetamine and he later advised him that he could supply him with any amount he needed.

13. After their initial meeting, CS-1 began to purchase "8-ball" quantities of methamphetamine from UCC-1 for himself and others. While making purchases of methamphetamine from UCC-1, CS-1 observed him with larger amounts in his possession. CS-1 estimated that he observed UCC-1 with up to at least one ounce of methamphetamine on occasion.

14. In approximately late December 2017, CS-1 attempted to contact UCC-1 to arrange to purchase a quantity of methamphetamine. UCC-1 told CS-1 that he was not in town, but his "business partner," later identified as MAY, would be able to accommodate any sales that were needed.

15. CS-1 reported making "8-ball" quantity methamphetamine purchases from MAY at various hotels in Washington, D.C. CS-1 stated that UCC-1 and MAY often shared a cellular phone number. CS-1 further noted that he often tried to call UCC-1 only for the phone to be answered by MAY. CS-1 estimated that he purchased an "8-ball" of suspected methamphetamine from MAY on approximately four occasions. CS-1 learned that MAY had methamphetamine customers in Alexandria, Virginia, and elsewhere. He stated that MAY met subjects near a hotel off of Eisenhower Avenue to conduct methamphetamine sales.

C. <u>Communications between CS-1, UCC-1, and MAY from April 10-12, 2018</u>

16. On April 10, 2018, under the direction and supervision of law enforcement, CS-1 attempted to contact UCC-1 at 202-817-9140 to arrange to purchase two ounces of methamphetamine. The following is a transcript of the text messages from April 10, 2018, through April 12, 2018. During these messages, CS-1 communicated with both UCC-1 and MAY on the same number, attempting to arrange the transaction:

| DATE | FROM | MESSAGE |
|---|---|---|
| 04/10/18 | CS-1 | Hi Gabe. This is Phil. My billionaire friend has finally reached out to me again. Are you ever back in town? |
| 04/10/18 | UCC-1 | Anytime |
| 04/10/18 | UCC-1 | What's up |
| 04/10/18 | CS-1 | I believe he is looking to stock up |
| 04/10/18 | CS-1 | His pattern of user must be like a squirrel collecting nuts for the winter. But I guess that kind of disapline comes with the territory if you're a billionaire…Lol. |
| 04/10/18 | UCC-1 | How many will he need |
| 04/10/18 | CS-1 | I will ask, but I'm assuming just one. I'm sure not more than two z. |
| 04/10/18 | UCC-1 | Ok |
| 04/10/18 | UCC-1 | Mr or Red will be there tomorrow |
| 04/10/18 | UCC-1 | Me or Red |
| 04/10/18 | UCC-1 | One of us |
| 04/1018 | CS-1 | Got that/But you two have somewhat different stocks. Ahem.. |
| 04/10/18 | UCC-1 | No it's the same |
| 04/10/18 | UCC-1 | Red gets from me its all the same |
| 04/10/18 | UCC-1 | When he is there he is me |
| 04/10/18 | CS-1 | Hmmm.. Ok, I'll check with im and get back to you on fix on timing. Cool? |
| 04/10/18 | UCC-1 | Cool |
| 04/10/18 | CS-1 | By him I mean my friend… An ok. Thank yoy much |
| 04/10/18 | UCC-1 | Ok |
| 04/11/18 | UCC-1 or MAY | Hi guys I have the 2 get one free sale this week |
| 04/12/18 | CS-1 | Update on my billionaire. He is off somewhere else thru the weekend. Is Monday possible, or early in the week? Apologies for the uncertainties of this. Billionaires work, think and play differently (apparently). Lol. I should be so lucky… |

5

| DATE | FROM | MESSAGE |
|---|---|---|
| 04/12/18 | MAY | Monday is cool but this is Red not Gabe |
| 04/12/18 | MAY | I was looking at your texts |
| 04/12/18 | MAY | He told u I would bee here this week not him right |
| 04/12/18 | CS-1 | Ok, And no problem. I'm frankly not sure who I was speaking with now… |
| 04/12/18 | MAY | I'm Red |
| 04/12/18 | MAY | The porn star |
| 04/12/18 | MAY | I take over when he is not here |
| 04/12/18 | CS-1 | Got that. But earlier this week I have no idea if I was speaking with you or Gabe. But it doesn't matter I gather. Two=one, right? |
| 04/12/18 | MAY | Did u talk to him on the phone |
| 04/12/18 | MAY | I'm black not Spanish u would know the difference |
| 04/12/18 | CS-1 | Anyway, I appreciate your flexibility |

17. Based on my training and experience, and through discussions with CS-1, I believe these communications demonstrate CS-1's attempt to purchase two ounces of methamphetamine from UCC-1 and/or MAY and receive one ounce free. These communications also outline the drug trafficking relationship and roles of UCC-1 and MAY.

D. <u>Seizure of methamphetamine on May 22, 2018 in Arlington, Virginia</u>

18. On or about May 22, 2018, in Arlington, Virginia, state law enforcement encountered CS-2, who possessed approximately 151 grams of methamphetamine, in addition to marijuana, packaging materials, and electronic devices.

19. CS-2 was informed of his right against self-incrimination and agreed to speak with state law enforcement officials without counsel in the hopes of obtaining favorable consideration on his future prosecution in Arlington County. CS-2 stated a large portion of the seized methamphetamine—the "clear" methamphetamine—was supplied by MAY, who was known to CS-2 as "Red." CS-2 reported that he obtained this methamphetamine within the previous week to two weeks. CS-2 told law enforcement that he met MAY in February or March 2018. CS-2 further reported that he received a phone call from MAY who told him that he

purchased a "contact list" and knew CS-2 purchased quantities of methamphetamine. After CS-2's initial meeting with MAY, CS-2 purchased one to two ounces of methamphetamine from MAY on a, roughly, weekly basis. CS-2 also met UCC-1 and was aware of MAY's business relationship with UCC-1.

20. CS-2 did not consent to a law enforcement search of his cellular phone. Law enforcement obtained a warrant in Arlington County. A search of the cellular telephone revealed that CS-2 exchanged text messages with telephone number (202) 817-9140, which CS-2 associated with the name "Red." This is the same phone number that CS-1 contacted to arrange methamphetamine transactions with MAY and UCC-1. On Thursday May 17, 2018, "Red" wrote, "Hi guys I'm so sorry I'm still in New York today I'm back to dc tomorrow." Responding the same day, CS-2 wrote, "Snickers Bar tomorrow for you!!"

21. Based on my training and experience and knowledge of this investigation, I believe these text messages corroborate CS-2's admission that the methamphetamine was provided by MAY within approximately one to two weeks of CS-2's encounter with law enforcement on May 22, 2018.

E. <u>Law enforcement seizure of methamphetamine on May 25, 2018</u>

22. On or about May 25, 2018, in Baltimore, Maryland, law enforcement received a "look-out" for a vehicle that was involved in reported sexual assault and abduction. An alleged victim contacted law enforcement from inside of the vehicle and reported that he was being held against his will. Officers observed the suspect vehicle and conducted a stop, during which the driver was identified as MAY. The alleged victim began to cry and told officers that there was a large quantity of drugs in the back of the vehicle.

23. Officers conducted a search of the trunk resulting in the discovery and seizure of

approximately 2070 grams of methamphetamine, a portion of which was inside a FedEx shipping box. Officers also located scales and packaging materials inside the vehicle.

F. <u>Statement of MAY</u>

24. After having been informed of his right against self-incrimination, MAY agreed to speak with law enforcement.

25. MAY stated that the FedEx package with methamphetamine was shipped by UCC-1 to MAY's address in New York. MAY initially denied knowledge of its contents, but later admitted that UCC-1 was supplying large quantities of methamphetamine.

G. <u>FedEx Packages containing methamphetamine shipped to Virginia</u>

26. In September 2018, law enforcement interviewed CS-3, who met UCC-1 in January 2018 in Palm Desert, California. CS-3 also learned of UCC-1 through his methamphetamine source of supply, UCC-2. UCC-2 supplied CS-3 and UCC-1 with pound quantities of methamphetamine for more than one year. UCC-2 told CS-3 that he "purchased" MAY from UCC-1 as a methamphetamine customer for $10,000.

27. CS-3 occasionally made FedEx labels and would email them to UCC-2 for FedEx shipments of drugs to MAY in Washington D.C., and elsewhere. CS-3 knew MAY purchased three pounds of methamphetamine from UCC-2 frequently, in addition to large quantities of gamma-hydroxybutyrate (GHB). In spring 2018, CS-3 attempted to retrieve a FedEx box containing approximately two pounds of methamphetamine that was shipped to MAY at a Walgreens in Washington D.C. MAY was unable to retrieve the package in a timely manner and the FedEx package was believed to have been stolen by Walgreens employees. During a visit to Washington D.C., CS-3 attempted, unsuccessfully, to retrieve the package from Walgreens.

28. CS-3 admitted to creating multiple fraudulent FedEx accounts. These fraudulent FedEx accounts were billed to and paid for by large businesses. Specifically, CS-3 linked the

fraudulent FedEx accounts to large business accounts, in hopes that the large businesses would not notice the FedEx packages that CS-3, UCC-2, and other co-conspirators shipped, all of which contained drugs, including methamphetamine and GHB.

29. In June 2018, law enforcement served FedEx with an administrative subpoena for records related to customer number 167270166. This number was identified through the FedEx package located in MAY's vehicle. Between June 2017 and June 2018, approximately forty-seven packages were mailed to locations in Washington, D.C, and Virginia. Specifically, four of the packages were addressed to Vienna, Alexandria, and Sterling, Virginia, all of which are located within the Eastern District of Virginia. A review of these packages showed they were associated with the same billing account as the package seized from MAY on May 25, 2018.

30. Furthermore, law enforcement spoke to FedEx officials who represented that all of the above mentioned packages came through their terminal/sorting center, located at Dulles Airport, within the Eastern District of Virginia.

## CONCLUSION

31. Based upon the foregoing, I believe probable cause exists that from in and around mid-2017 to on or about May 25, 2018, in the Eastern District of Virginia and elsewhere, KENDESIA MAY, a/k/a "Red," a/k/a "Reds," did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others, both known and unknown, to unlawfully, knowingly, and intentionally distribute 50 grams or more of methamphetamine (actual), a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

Kendrah Peterson
Special Agent
Drug Enforcement Administration

Sworn and subscribed to before me the 19th day of October, 2018.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa C. Buchanan
United States Magistrate Judge